**No. 26-1095; No. 26-1171**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee/Cross-Appellant,

v.

STATE OF MAINE,

Defendant-Appellant/Cross-Appellee.

---

On Appeal from the United States District Court for the District of Maine

---

# PRINCIPAL BRIEF OF STATE OF MAINE

AARON M. FREY
Attorney General

THOMAS A. KNOWLTON
Chief, Litigation Division
Deputy Attorney General

KIMBERLY L. PATWARDHAN
Assistant Attorney General

Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333–0006
(207) 626-8800

*Attorneys for State of Maine*

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .......... 1

INTRODUCTION .......... 2

STATEMENT OF THE ISSUES .......... 4

I. Whether the District Court erred by interpreting the modification provision of the Agreement to incorporate the Rule 60(b) standard without considering ordinary contract principles, including the Parties' intent .......... 4

II. Whether the District Court otherwise erred in its application of Rule 60(b) in evaluating the Parties' motion to modify the Agreement .......... 4

STATEMENT OF THE CASE .......... 5

A. The substance of the Agreement .......... 6

B. The form of the Agreement .......... 11

C. Early implementation of the Agreement .......... 13

D. Proceedings below .......... 15

E. Ongoing implementation of the Agreement .......... 16

SUMMARY OF ARGUMENT .......... 19

ARGUMENT .......... 20

I. The District Court incorrectly interpreted the modification provision of the Agreement to incorporate the Rule 60(b) standard for altering or amending a judgment .......... 20

A. Ordinary contract principles apply to interpret the scope of the Agreement .......... 20

B. The Agreement's plain language for modifications does not incorporate the Rule 60(b) standard to alter or amend a judgment ....23

C. The District Court erred by failing to apply ordinary contract principles when analyzing the modification provision of the Agreement....27

II. Application of Rule 60(b) to settlements spanning multiple years requires a flexible approach....29

CONCLUSION....31

CERTIFICATE OF COMPLIANCE....33

CERTIFICATE OF SERVICE....34

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alexis Lichine & Cie v. Sacha A. Lichine Est. Selections, Ltd.*,
45 F.3d 582 (1st Cir. 1995) .......... 30

*AMF Inc. v. Jewett*, 711 F.2d 1096 (1st Cir. 1983) .......... 20

*Aronov v. Napolitano*, 562 F.3d 84 (1st Cir. 2009) .......... 26, 27

*Baez v. Baymark Detoxification Servs., Inc.*, 123 F.4th 62 (1st Cir. 2024) .......... 29

*Bates v. Dep't of Behavioral & Developmental Servs.*,
2004 ME 154, 863 A.2d 890 .......... 12

*BLOM Bank SAL v. Honickman*, 605 U.S. 204 (2025) .......... 29, 30

*City of Covington v. Covington Landing Ltd. P'ship*,
71 F.3d 1221 (6th Cir. 1995) .......... 22

*Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, 1 A.3d 416 .......... 28

*Cook v. City of Chicago*, 192 F.3d 693 (7th Cir. 1999) .......... 22

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) .......... 21

*Doe v. Pataki*, 481 F.3d 69 (2d Cir. 2007) .......... 21

*Estate of Barrows*, 2006 ME 143, 913 A.2d 608 .......... 28

*F.T.C. v. Leshin*, 618 F.3d 1221 (11th Cir. 2010) .......... 22

*Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1 (1st Cir. 2008) .......... 31

*Flores v. Garland*, 3 F.4th 1145 (9th Cir. 2021) .......... 22

*Heath v. De Courcy*, 888 F.2d 1105 (6th Cir. 1989) .......... 30

*Hodgkins v. New England Tel. Co.*, 82 F.3d 1226 (1st Cir. 1996) .......... 28

*Horne v. Flores*, 557 U.S. 433 (2009) .......... 30, 31

*Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1 (1st Cir. 2011) .......... 26, 27

*I.C.C. v. Holmes Transp., Inc.*, 983 F.2d 1122 (1st Cir. 1993) ..............................29

*In re Pearson*, 990 F.2d 653 (1st Cir. 1993).........................................................11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. L*iab. Litig., 975 F.3d 770 (9th Cir. 2020) ..........................................................................26

*Johnson v. Robinson*, 987 F.2d 1043 (4th Cir. 1993) ............................................21

*Keepseagle v. Vilsack*, 118 F. Supp. 3d 98 (D.D.C. 2015)....................................26

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).................. 25, 26

*Mathewson Corp. v. Allied Marine Indust., Inc.*, 827 F.2d 850 (1st Cir. 1987)......31

*Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325 (1st Cir. 1991)............. *passim*

*Olmstead v. L.C.*, 527 U.S. 581 (1999)....................................................................2

*Ricci v. Patrick*, 544 F.3d 8 (1st Cir. 2008) ..........................................................20

*Rufo v. Inmates of Suffolk County*, 502 U.S. 367 (1992)................................ 29, 30

*S. Kingston Sch. Comm. v. Joanna S.*, 773 F.3d 344 (1st Cir. 2014) ......................28

*Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007)...................................................22

*Sinclair Oil Corp. v. Scherer*, 7 F.3d 191 (10th Cir. 1993) ....................................22

*System Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642 (1961)..............................................................................................11

*United States v. Alabama*, Civil Action No. 2:15-cv-368-MHT (M.D. Ala. Oct. 27, 2023)..................................................................................11

*United States v. Armour & Co.*, 402 U.S. 673 (1971) ...........................................25

*United States v. Charter Int'l Oil Co.*, 83 F.3d 510 (1st Cir. 1996)........... 23, 25, 28

*United States v. City of Fort Smith*, 48 F.4th 900 (8th Cir. 2022)..........................22

*United States v. Guam*, No. CV 02-00022, 2015 WL 13776540 (D. Guam Mar. 25, 2015) ................................................26

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975) ...............................23

*United States v. New Jersey*, 194 F.3d 426 (3d Cir. 1999) .....21

*United States v. Puerto Rico*, 460 F. Supp. 3d 159 (D.P.R. 2020) .....11

*United States v. Puerto Rico*, Civil No. 12-2039 (GAG), 2018 WL 11585308 (D.P.R. Dec. 4, 2018) .....11

*United States v. Tennessee*, 780 F.3d 332 (6th Cir. 2015) .....11

*VanDesande v. United States*, 673 F.3d 1342 (Fed. Cir. 2012) .....23

**Statutes**

28 U.S.C. § 1291 .....1

28 U.S.C. § 1331 .....1

28 U.S.C. § 1345 .....1

42 U.S.C. § 12101 .....2

42 U.S.C. § 12205 .....27

5 M.R.S.A. § 1825-E(2) .....19

22 M.R.S.A. § 3173-J .....9

**Rules**

Fed. R. App. P. 4 .....1

Fed. R. Civ. P. 12 .....5

Fed. R. Civ. P. 41 .....5

Fed. R. Civ. P. 60(b) ..... *passim*

Fed. R. Civ. P. 60(b)(1)-(3) .....25

**Regulations**

10-144 C.M.R. ch. 101, ch. I, § 7 ....................17

10-144 C.M.R. ch. 101, ch. II, § 13 ....................17

10-144 C.M.R. ch. 101, ch. II, § 92 ....................17

10-144 C.M.R. ch. 101, ch. II, § 28 .................... 17, 18

10-144 C.M.R. ch. 101, ch. II, § 65 .................... 17, 18

10-144 C.M.R. ch. 101, ch. II, § 66 ....................18

10-144 C.M.R. ch. 101, ch. II, § 97 .................... 17, 18

**Other Authorities**

Me. Dep't of Health and Human Servs., *The Children's Behavioral Health Settleme*nt Agreement, https://www.maine.gov/dhhs/obh/support-services/childrens-behavioral-health/settlement-agreement (last visited July 9, 2026) .................... 7, 11, 24

Me. Dep't of Admin. and Fin. Servs., Independent Reviewer, https://www.maine.gov/dafs/bbm/procurementservices/node/26327 (last visited July 9, 2026)....................14

CGI Advantage, Welcome Page, https://mevss.hostams.com/PRDVSS1X1/AltSelfService (last visited Jul. 13, 2026) (search "Independent Reviewer") .....18

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345, and the Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291. The District Court's November 24, 2025, order is a final order that disposes of all parties' claims.

The State of Maine's appeal is timely because it was filed on January 23, 2026, *see* Appendix ("A._") A.8, which is 60 days after the entry of the District Court's Order on November 24, 2025. *See* Fed. R. App. P. 4(a)(1)(B)(i) (permitting any party to file a notice of appeal "within 60 days after entry of judgment or order appealed from if one of the parties is . . . the United States").

The United States's appeal is timely because it was filed on February 13, 2026, A.9, which was within the time permitted by the District Court. ECF No. 64 (granting in part United States's motion to extend time to file notice of appeal and permitting United States until February 20, 2026, to file a notice of appeal). *See also* Fed. R. App. P. 4(a)(3) (allowing a cross-appeal to be filed within 14 days after a timely notice of appeal is filed); Fed. R. App. P. 4(a)(5)(A)(i) (allowing for an extension of the time to file a notice of appeal upon motion filed within the appeal period).

## INTRODUCTION

In November 2024, the State of Maine and the United States ("Parties") executed a comprehensive settlement agreement ("Agreement") to resolve the United States' complaint brought under Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101 et seq. *See* A.41-82. The United States claimed that Maine unnecessarily segregated children with behavioral disabilities in treatment facilities by failing to provide those children with community-based behavioral health services. *See generally Olmstead v. L.C.*, 527 U.S. 581 (1999) (concluding that discrimination against persons with disabilities under the ADA includes unjustified segregation of those persons when community-based services are appropriate, not opposed, and can be reasonably accommodated).

The Agreement reflects an historic, multi-year commitment by Maine to strengthen its Medicaid program ("MaineCare") to ensure that Children with behavioral health disabilities receive timely services and do not unnecessarily enter or remain in an emergency department or an Out-of-Home Placement.[1] A.42, § I(F). The Agreement became effective on December 20, 2024, when the District Court dismissed the case but retained "jurisdiction to enforce the Parties' Settlement

[1] Capitalized phrases in this brief have the same meaning as in the Agreement. "Child/Children" is defined at Section II of the Agreement. A.43-44, § II; A.75, App'x A § D. "Out-of-Home Placement" is defined in Appendix A of the Agreement. A. 77, App'x A § R.

Agreement" "in accordance with its terms and for its duration." A.39; A.69, §§ XII.C-D. *See also* ECF No. 21 (entering judgment of dismissal).

As part of the Agreement, the Parties included a modification provision to allow agreed-upon changes. A.71, § XIV(G). In September 2025, the Parties executed a written modification to their Agreement ("Modified Agreement") in accordance with that provision, A.117, and jointly moved to modify the Agreement with the District Court, A.6, A.83-87. The impetus for the Modified Agreement was the Parties' failure to agree upon an Independent Reviewer in accordance with the State's procurement process and the United States's internal selection process. A.65, § XI(A)(1). In the Modified Agreement, the Parties agreed to remove the requirement of the Independent Reviewer, clarify certain responsibilities, and account for Maine's learned experiences during the first eight months of implementing the Agreement. A.83-84. But none of the changes in the Modified Agreement diminished the substantive measures Maine promised to undertake to ensure that Children do not unnecessarily enter or remain in an emergency department of Out-of-Home Placement.

Although the Parties agreed to the modifications and presented the Court with a joint motion, the District Court denied the Parties' motion to modify. Addendum ("Add.") 24. In doing so, the District Court credited the arguments of a group of advocates over those presented by the Parties and erred in two fundamental ways.

First, the District Court applied the standard provided in Fed. R. Civ. P. 60(b) to review the motion, even though the modification provision does not incorporate that standard and the Parties did not intend that standard to apply to their modification provision. Second, the District Court ignored key differences between the Parties' motion to modify the Agreement and a typical Rule 60(b) motion.

Those errors have denied Maine a key benefit of the bargain that it struck with the United States in the Agreement—the ability to modify the Agreement outside the strictures of Rule 60(b). In a multi-year agreement that will span multiple state and federal administrations, the modification provision is a critical tool for the Parties to adjust the Agreement when appropriate and necessary to achieve the Agreement's goals and requirements in accordance with the inevitable changes and developments that will occur along the way. Maine respectfully requests that the District Court's decision be vacated.

**STATEMENT OF THE ISSUES**

**I.** Whether the District Court erred by interpreting the modification provision of the Agreement to incorporate the Rule 60(b) standard without considering ordinary contract principles, including the Parties' intent.

**II.** Whether the District Court otherwise erred in its application of Rule 60(b) in evaluating the Parties' motion to modify the Agreement.

## STATEMENT OF THE CASE

In January 2021, the United States opened an investigation under Title II of ADA and its implementing regulation into Maine's service system for children with behavioral health disabilities. A.41. That investigation ended on June 22, 2022, when the United States issued a letter with its findings that Maine was not in compliance with the integration mandate of Title II of the ADA. A.41.

Although Maine disputed the findings, Maine and the United States began a multi-year negotiation to resolve the investigation of Maine's furnishment of behavioral health services to children with behavioral health disabilities. A.41. Those negotiations continued after the United States filed the instant suit on September 9, 2024, A.3, and culminated in the execution of the Agreement on November 22, 2024, A.74.

On November 26, 2024, the Parties jointly moved for dismissal under Fed. R. Civ. P. 41(a)(2) and requested that the District Court retain jurisdiction to enforce the Agreement.[2] A.5. *See also* ECF No. 17. Maine thus did not answer or otherwise respond to the United States's complaint. *See* Fed. R. Civ. P. 12.

On December 20, 2024, the Court granted the Parties' motion, and the Clerk entered a judgment of dismissal. A.5. Prior to granting the motion, the Court did

[2] Rule 41 provides, in relevant part, that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

not hold a status conference, hearing, or other proceeding with respect to the Agreement or the Parties' motion. A.3-5. No other party moved to intervene or participate in the proceeding. A. 3-5. The Court simply endorsed the Parties' proposed order, and dismissed the case roughly four months after it was filed. A.39. *See also* ECF No. 17-1.

**A. The substance of the Agreement**

The Agreement applies to individuals up to their 21st birthday who have Behavioral Health Disabilities and are 1) "eligible for, and, as applicable, are enrolled to receive behavioral health services offered, paid for, and/or administered by the Maine Department of Health and Human Services (Maine DHHS); and" 2) "at serious risk of an Out-of-Home Placement, are in an Out-of-Home Placement, or have an Emergency Department Stay during the pendency of th[e] Agreement." A.43, § II.A. In addition, a Child must also meet one of four additional criteria to be within the target population of the Agreement. A.43-44, §§ II.A, II.B.1-4. Thus, the Agreement does not cover all youth in Maine, but those with significant, demonstrated behavioral health needs.

The Agreement includes numerous benchmarks and timelines that Maine must meet in order to be in substantial compliance with the Agreement. *See, e.g.*, A.49, § III.B.7.x.a; A.62-64, §§ IX.H.1-5. The Agreement includes several key

promises by Maine to improve access to Community-Based Services for Children and accomplish the Agreement's goals. A.43, § I(L).

*First*, Maine agreed to create a unified process to determine the clinically-appropriate level of care and services needed to meet a Child's behavioral health needs. A.44-46, § III.A. This process is called the Single Assessment, and it was implemented in February of 2026.[3] A.44, § III.A.1. The Single Assessment is the only assessment used to determine a Child's eligibility for Medium or High Intensity Behavioral Health Services.[4] A.45, § III.A.4. Under the prior system, upon referral, service providers evaluated a Child to determine their eligibility for the services that particular provider furnished. That prior system led to long waitlists and delays because of the potential for mismatch between a child's needs and the services available from that provider. Under the Single Assessment, one process now evaluates a Child's needs, goals, and strengths and determines that Child's eligibility

---

[3] On May 27, 2025, Maine and the United States Agreed to a 30-day extension of all deadlines in the Agreement. The Parties agreed to several other deadline extensions, all of which have been published on the website maintained by Maine regarding the Agreement. *See* Me. Dep't of Health and Human Servs., *The Children's Behavioral Health Settlement Agreement*, https://www.maine.gov/dhhs/obh/support-services/childrens-behavioral-health/settlement-agreement (last visited July 9, 2026).

[4] Services that are not designated as Medium or High Intensity Behavioral Health Services have separate eligibility determinations. *See* A.77, App'x A § O (defining Medium or High Intensity Behavioral Health Services).

for a variety of services. The Child and their Family can then choose the best service for the Child.

*Second*, Maine agreed to improve its care coordination services for Children. Care coordination is a service planning and coordination process provided to Children to and their Families for selecting and organizing services that a Child may need to address their behavioral health needs and live in a Family Home. A.46, § III.B.1. Under the Agreement, all Children have access to care coordination guided by Wraparound Planning Principles, including principles of family and voice choice, collaboration, and community-based. A. 46-47, §§ III.B.3-4. Certain Children may also be eligible for High-Fidelity Wraparound ("HFW") Care Coordination, which is an intensive team-based type of Care Coordination. *See* A.47, § III.B.4; A.76-77, App'x A § M.

Care coordination results in a written Individualized Service Plan ("ISP") that, among other requirements, "[i]dentifies the Child's strengths, goals, needs, and desired outcomes" and documents the services the Child is receiving or eligible to receive, including the frequency and intensity of services, any barriers to receiving a particular service, and whether any adjustments are needed. A.47, §§ III.B.5.i-ii; *see also* A.48-49, §§ III.B.7.i-xi (detailing responsibilities of care coordinators). A Child's ISP must be periodically updated and updated upon request after a significant change in the Child's circumstances. A.49, § III.B.7.x.b. The ISP must

also document the Informed Choice of the Child and Family about the setting where the Child will live and receive services. A.50, § III.B.8.ii; A.77, App'x A § N.

*Third*, Maine agreed to provide a variety of community-based services to Children on a Timely and statewide basis. A.51-52, §§ IV.A-C; A.78, App's A § U (defining "Timely"). Those services include crisis services and an array of intensive, in-home behavioral health treatment services. A.52-54, §§ IV.D-E.

*Fourth*, Maine agreed to a variety of improvements focused on addressing workforce shortages and ensuring continuity of services. A.55-58, § VI. Those improvements include developing a plan to address current or future workforce shortages and "ensure that the number and quality of Community Providers are sufficient to enable Children to remain in, or successfully transition back to, Family Homes with necessary Community-Based Services, if consistent with their ISPs, and to have long-term stability in Family Homes throughout the State." A.56, § VI.B. The Agreement requires Maine to redesign certain training programs to train or upskill current members of the workforce to become Community Providers, A.56, § VI.C, and implement new training policies for Community Providers and Care Coordinators, A.57-58, § VI.I. Maine also agreed that, in accordance with state law, 22 M.R.S.A. § 3173-J (Supp. 2026), it would provide annual cost of living adjustments through MaineCare provider rates for Community-Based Services. A.58, § VII.

*Fifth*, Maine agreed to return Children receiving behavioral health services in an Out-of-Home Placement to a Family Home, when appropriate and not opposed by the Child's Family ("Community Return"). A.58, §§ VIII.A-B. Preparation for Community Return must begin on the Child's first day in an Out-of-Home Placement. A.58, § VIII.B. Maine also agreed to seek to prevent Children who achieve "Community Return from unnecessarily (1) having an Emergency Department Stay or (2) entering or remaining in in an Out-of-Home Placement." A.58, § VIII.E.

*Sixth*, Maine agreed to develop a comprehensive Implementation Plan to set out the State's plan to implement the Agreement. A.59-60, § IX.B. Among other requirements, the Implementation Plan must "[e]stablish clear strategies to achieve Agreement initiatives and outcomes," identify the State actor responsible for each initiative and timeline, include "a Data Collection and Analysis Plan," and be updated biennially. A.59-60, §§ IX.B, IX.C. In other words, the Implementation Plan is the roadmap for Maine's compliance with the Agreement. Maine finalized and published its Implementation Plan on November 1, 2025; finalized and published its Data Collection and Analysis Plan on December 31, 2025; and provided public updates on Maine's implementation progress in March of 2026.[5] *See* A.61, § IX.E.

---

[5] These documents are available on the website maintained by Maine regarding the

*Finally*, the Agreement will terminate after 6 years without further action from the District Court, unless the Parties agree in writing to extend the term of the Agreement or the Agreement is extended upon motion. A.69, § XIII.A.

**B. The form of the Agreement.**

The Parties agreed that the Agreement would be court enforceable, A.69, §§ XII.C-D, but the Agreement is not a consent decree. The traditional hallmarks of a consent decree include ongoing, regular case management by the District Court,[6] regular reporting to the District Court on compliance with the decree,[7] and a court-appointed monitor answerable to the District Court.[8]

---

Agreement. *See* Me. Dep't of Health and Human Servs., *The Children's Behavioral Health Settlement Agreement*, https://www.maine.gov/dhhs/obh/support-services/childrens-behavioral-health/settlement-agreement (last visited July 9, 2026).

[6] *See, e.g.*, *System Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) (explaining that structural injunctions "often require[ ] continuing supervision by the issuing court"); *In re Pearson*, 990 F.2d 653, 658 (1st Cir. 1993) (noting "ongoing supervisory responsibility" of court over consent decree).

[7] *See, e.g.*, *United States v. Alabama*, Civil Action No. 2:15-cv-368-MHT, at *2 (M.D. Ala. Oct. 27, 2023) (ordering regular compliance reports to be filed with the trial court); *United States v. Puerto Rico*, Civil No. 12-2039 (GAG), 2018 WL 11585308 (D.P.R. Dec. 4, 2018) (appointing special master to make reports and recommendations to the trial court) (Gelpi, J.).

[8] *See, e.g.*, *United States v. Tennessee*, 780 F.3d 332, 335 (6th Cir. 2015) (describing court-appointed monitor in consent decree "as a neutral agent of the court"); *United States v. Puerto Rico*, 460 F. Supp. 3d 159, 160-61 (D.P.R. 2020) (noting court-appointed monitor and their staff employed to oversee consent decree are "fully deputized judicial officers" regulated by the federal court) (Gelpi, J.).

Based on Maine's experience with such agreements in the past, *see generally Bates v. Dep't of Behavioral & Developmental Servs.*, 2004 ME 154, 863 A.2d 890 (addressing AMHI consent decree), Maine bargained for an agreement that did not include these features. Accordingly, the Agreement contains none of the hallmarks of a traditional consent decree.

The Agreement does not include any regular, ongoing role for the District Court. In accordance with the Parties' Agreement, the District Court conditionally dismissed the underlying case in December 2024. A.5; A.69, § XII.C. Thus, the Parties contemplated that the District Court would be available, if needed, to resolve disputes that they were not able to resolve on their own, A.72-73, §§ XV.A-C (mandatory dispute resolution provisions), but that the case would otherwise remain dismissed and inactive. That is how the case proceeded for several months before the Coalition filed a notice in July 2025. A.5.

Nor does the Agreement require Maine or any other entity to submit reports to the District Court on Maine's compliance with the Agreement. Instead, annual compliance reporting is reviewed by the Parties and maintained by Maine, outside of the court process. A.66, § XI.C.

Finally, under the Agreement, the Parties select the Independent Reviewer, with no input from the District Court. A.65, § X.A. The Independent Reviewer serves as a state contractor selected through Maine's procurement ("RFP") process

and the United States's selection process. A.65, § X.A; A.68, § X.G.2.i. The contract of the Independent Reviewer can be "terminated or not renewed" without any action by the District Court. A.65, § XI.A.2. The Parties agreed that the Independent Reviewer could analyze, advise, and report, *see* A.65-66, § XI.B.1, but the Independent Reviewer was not authorized to determine, finally, the State's compliance or non-compliance with the Agreement. Instead, the Parties agreed that the Independent Reviewer would serve as a resource for the Parties as the Agreement progressed.

Of course, the Agreement is court enforceable upon motion. But the form of the Agreement is far from a traditional consent decree with ongoing, active management by the judge or other judicial officer.

### C. Early implementation of the Agreement.

Because the Agreement required the Parties to select the Independent Reviewer within four months of the Agreement's Effective Date, *see* A.65, § XI.A, the Parties quickly got to work on the RFP. A.65, § XI.A.1 ("The RFP will be mutually developed by the Parties to comply with [Maine]'s competitive bidding process and the United States' process for selecting an independent reviewer."). The

RFP was posted on February 18, 2025, and Independent Reviewer proposals were due on March 17, 2025.[9]

On April 11, 2025, Maine conditionally awarded the Independent Reviewer Contract to Inspired Consulting Group. However, on May 16, 2025, Maine withdrew the conditional contract because Inspired Consulting Group was not approved during the United States's internal "process for selecting" the Independent Reviewer. A.65, § XI.A.1.

Thereafter, the United States informed Maine that it had "reconsidered its earlier position and now supports self-reporting by Maine, in place of an Independent Reviewer, as a means of updating the United States on compliance with the Settlement Agreement." A.85. The Parties then negotiated a modification to their Agreement, and the Modified Agreement was executed on September 2, 2025. A.117.

Most of the changes in the Modified Agreement relate to the elimination of the role of the Independent Reviewer and the removal of all related provisions. A.151-55. Importantly, however, none of the key promises described above that Maine made in the Agreement changed or diminished in the Modified Agreement.

---

[9] Information about the Independent Reviewer RFP and documents discussed in this paragraph and the next are available on Maine's procurement website. *See* Me. Dep't of Admin. and Fin. Servs., *Independent Reviewer*, https://www.maine.gov/dafs/bbm/procurementservices/node/26327 (last visited July 9, 2026).

Put another way, the changes agreed upon the by Parties were to the Agreement's scaffolding, not the substantive measures Maine promised to undertake to ensure that Children do not unnecessarily enter or remain in an emergency department of Out-of-Home Placement.

After executing the Modified Agreement, the Parties proceeded in accordance with its terms, including finalizing the Implementation Plan and the Data Collection and Analysis Plan.[10] *Compare* A.59, § IX.B. (requiring draft Implementation Plan and Data Collection and Analysis Plan to be submitted to the Independent Reviewer and the United States the later of 120 days after the Effective Date or within 1 week of the retention of the Independent Reviewer), *with* A.106, A.108, §§ IX.B, IX.E (requiring the Implementation Plan to be finalized by November 1, 2025, and the Data Collection and Analysis Plan to be finalized by December 31, 2025).

### D. Proceedings below.

The Parties jointly moved to modify the Agreement on September 2, 2025. A.6. A group of advocate organizations ("Coalition") were permitted to file an amicus brief with respect to the motion to modify, ECF No. 35, and both the United States and Maine filed responses to the Coalition's amicus, ECF Nos. 41, 43. A.6-7. The court heard oral argument on the motion to modify on October 22, 2025, A.7, and then permitted the Parties and the Coalition to file post-hearing briefs on the

[10] *See supra* at 10 & n.5.

"Court's authority to approve or not approve the joint modification of the" Agreement. A.7. After post-hearing briefing, the District Court denied the motion to modify without prejudice. Add. 24.

In its order, the District Court focused on the form of the Agreement, rather than the four corners of the Agreement, and concluded that the Agreement's form dictated the standard for reviewing modification. Add. 6-8, 16-17. The court rejected the Parties' arguments showing their understanding of the modification provision, Add. 5-14, and instead applied Rule 60(b). The Court concluded that the requirements of Rule 60(b) had not been met and denied the Parties' motion. Add. 14-24.

Both Maine and the United States filed timely notices of appeal. A.8-9.

**E. Ongoing implementation of the Agreement.**

Since November 2025, Maine has continued its implementation of the Agreement. As noted, Maine finalized and published its Implementation Plan on November 1, 2025; finalized and published its Data Collection and Analysis Plan on December 31, 2025; and provided public updates on Maine's implementation progress in March of 2026.[11]

In accordance with the Implementation Plan, Maine DHHS engaged in agency rulemaking to amend or adopt six agency rules within its MaineCare Benefit

---

[11] *See supra* at 10 & n.5.

Manual. These rules that were so adopted and amended all pertained to children's behavioral health services funded under MaineCare and were necessary to comply with the Agreement (and Modified Agreement). Those rules are:

- Children's Behavioral Health Services Global Rule, 10-144 C.M.R. ch. 101, ch. I, § 7;
- Targeted Case Management Services, 10-144 C.M.R. ch. 101, ch. II, § 13;
- Behavioral Health Home Services, 10-144 C.M.R. ch. 101, ch. II, § 92;
- Rehabilitative and Community Support Services for Children with Cognitive Impairments and Functional Limitations, 10-144 C.M.R. ch. 101, ch. II, § 28;
- Private Non-Medical Institution Services, 10-144 C.M.R. ch. 101, ch. II, § 97; and
- Behavioral Health Services, 10-144 C.M.R. ch. 101, ch. II, § 65.

Those rules became effective on an emergency basis on January 30, 2026,[12] and were finally adopted with various effective dates in April of 2026.[13]

[12] Children's Behavioral Health Services Global Rule, 10-144 C.M.R. ch. 101, ch. I, § 7 (eff. Jan. 30, 2026); Targeted Case Management Services, 10-144 C.M.R. ch. 101, ch. II, § 13(eff. Jan. 30, 2026); Behavioral Health Home Services, 10-144 C.M.R. ch. 101, ch. II, § 92 (eff. Jan. 30, 2026); Rehabilitative and Community Support Services for Children with Cognitive Impairments and Functional Limitations, 10-144 C.M.R. ch. 101, ch. II, § 28 (eff. Jan. 30, 2026); Private Non-Medical Institution Services, 10-144 C.M.R. ch. 101, ch. II, § 97 (eff. Jan. 30, 2026); Behavioral Health Services, 10-144 C.M.R. ch. 101, ch. II, § 65 (eff. Jan. 30, 2026).

[13] Children's Behavioral Health Services Global Rule, 10-144 C.M.R. ch. 101, ch. I, § 7 (eff. Apr. 18, 2026); Targeted Case Management Services, 10-144 C.M.R. ch. 101, ch. II, § 13 (eff. Apr. 28, 2026); Behavioral Health Home Services, 10-144

In accordance with the Agreement, Maine launched the Single Assessment effective February 2, 2026.[14] A.44, § III.A.1. Further, more than 50% of all care coordinators received training in Wraparound Planning Principles by February 2, 2026.[15] A.62, § IX.H.1.ii. Three providers already have been approved to deliver HFW Care Coordination services, and Maine DHHS is working to recruit additional providers.[16]

After the court denied the Parties' Motion for Modification, Maine DHHS published a new Independent Reviewer RFP on March 4, 2026.[17] On April 21, 2026, Maine DHHS conditionally awarded the RFP contract to Learn Innovate Accelerate

C.M.R. ch. 101, ch. II, § 92 (eff. Apr. 28, 2026); Rehabilitative and Community Support Services for Children with Cognitive Impairments and Functional Limitations, 10-144 C.M.R. ch. 101, ch. II, § 28 (eff. Apr. 29, 2026); Private Non-Medical Institution Services, 10-144 C.M.R. ch. 101, ch. II, § 97 (eff. Apr. 28, 2026); Behavioral Health Services, 10-144 C.M.R. ch. 101, ch. II, § 65 (eff. Apr. 28, 2026). *See also* Crisis Services, 10-144 C.M.R. ch. 101, ch. II, § 66 (eff. Apr. 28, 2026).

[14] *See* CBHS Quarterly Update, Quarter 1: January 1, 2026, - March 31, 2026, at 4, *supra* n.5.

[15] *See* CBHS Quarterly Update, Quarter 1: January 1, 2026, - March 31, 2026, at 7, *supra* n.5.

[16] *See* CBHS Quarterly Update, Quarter 1: January 1, 2026, - March 31, 2026, at 6, *supra* n.5.

[17] Documents related to the second Independent Reviewer RFP are publicly available under "Public Access" in Maine's procurement vendor self-service system. CGI Advantage, Welcome Page, https://mevss.hostams.com/PRDVSS1X1/AltSelfService (last visited Jul. 13, 2026) (search "Independent Reviewer").

LLC. However, an unsuccessful bidder challenged the award decision in accordance with state law, 5 M.R.S.A. § 1825-E(2) (Pamph. 2026), and that bidder's administrative appeal is still pending. Accordingly, Maine has been implementing the Agreement without an Independent Reviewer for more than a year and a half.

## SUMMARY OF ARGUMENT

Ordinary contract principles apply when interpreting the scope of a settlement agreement over which a district court has retained jurisdiction. Like any other contract, that interpretation must start with the language of the parties' agreement in order to give effect to the parties' intent.

The District Court erred because it failed to apply these bedrock principles, instead concluding, in error, that the Agreement was a "consent decree" and using that conclusion to guide its analysis. That error deprived Maine of the benefit of its bargain with the United States, which included a modification provision that the Parties intended to function outside the strictures of Fed. R. Civ. P. 60(b).

The District Court also erred by applying an overly rigid version of Rule 60(b) to the Agreement. The strict interpretation applied by the District Court is at odds with Supreme Court and this Court's precedent. Instead, a flexible approach must guide any future application of Rule 60(b) to the Agreement.

## ARGUMENT

### I. The District Court incorrectly interpreted the modification provision of the Agreement to incorporate the Rule 60(b) standard for altering or amending a judgment.

The interpretation of a settlement agreement, like the Agreement, is the interpretation of a contract and constitutes a question of law. *Ricci v. Patrick*, 544 F.3d 8, 17 (1st Cir. 2008); *AMF Inc. v. Jewett*, 711 F.2d 1096, 1100-01 (1st Cir. 1983). Accordingly, this Court's review of the trial court's interpretation of the Agreement is de novo. *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1337-40 (1st Cir. 1991); *Ricci*, 544 F.3d at 17 ("The terms of the" Agreement "like any contract construction issue, present an issue of law that we review de novo.").

#### A. Ordinary contract principles apply to interpret the scope of the Agreement.

When reviewing District Court decisions regarding the enforcement or interpretation of a public law court enforceable agreement,[18] this Court has afforded district courts "broad discretion in determining such matters as whether the objectives of the decree have been substantially achieved." *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1337 (1st Cir. 1991). Here, however, the issue

[18] Although the Agreement is not a traditional consent decree, *see supra* at 11-13, that distinction does not matter for purposes of interpreting the Agreement. Both private settlement agreements and consent decrees are interpreted using ordinary contract principles. Although Maine does not concede that the Agreement constitutes a consent decree in the traditional sense, cases interpreting consent decrees are still instructive.

does not relate to Maine's compliance with the substantive provisions of the Agreement, but "determining the scope of the parties' original bargain." *Id.* at 1339.

Accordingly, "[o]rdinary contract principles, involving determination of the parties' intent when they entered into the stipulation, are the appropriate interpretative guideposts here." *Id.* at 1339. That is because "[p]arties to a consent decree [or other court enforceable agreement] are entitled to know that their negotiated choices will be respected" and "that a consent decree [or other court enforceable agreement] will not be treated as a mere entering wedge which, once entered, gives a district court untrammeled discretion to" vary or expand the parties' original agreement. *Id.* at 1339 n.17.

This Circuit's precedent applying ordinary rules of contract interpretation to consent decrees and settlement agreements is in accord with all of its sister Circuits. *See, e.g.*, *Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007) (consent decrees "reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable"); *United States v. New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999) ("consent decrees have many of the attributes of contracts, we interpret them with reference to traditional principles of contract interpretation"); *Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993) ("Even given their distinctive character as agreements backed by the authority of the court, consent decrees are to be interpreted as contracts."); *Dean v. City of*

*Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006) ("[w]hen interpreting a consent decree, general principles of contract interpretation govern"); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) ("An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation."); *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (Posner, C.J.) (holding that consent decrees are contracts from the standpoint of interpretation); *United States v. City of Fort Smith*, 48 F.4th 900, 907 (8th Cir. 2022) ("Because the content of a consent decree is generally a product of negotiations between the parties," such decrees are construed in accordance with the "rules of contract interpretation" (quotation marks omitted)); *Flores v. Garland*, 3 F.4th 1145, 1155 n.7 (9th Cir. 2021) ("We refer to California law in interpreting the Agreement because we use contract principles in construing consent decrees, and the contract law of the situs state applies." (cleaned up)); *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 194 (10th Cir. 1993) (interpreting consent decree "basically as a contract" and explaining "the terms of the decree and the respective obligations of the parties must be found within the four corners of the consent decree") (cleaned up)); *F.T.C. v. Leshin*, 618 F.3d 1221, 1231 (11th Cir. 2010) ("The rules we use to interpret a consent decree are the same ones we use to interpret a contract—since a consent decree is a form of contract." (cleaned up)); *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (consent decree is "essentially

a contract," and "construction of a consent decree is essentially a matter of contract law") (cleaned up)); *VanDesande v. United States*, 673 F.3d 1342, 1349-50 (Fed. Cir. 2012) (concluding settlement agreements and consent decrees should be viewed as contracts for purposes of interpretation and enforcement).

Interpretation of the Agreement thus proceeds from its "four corners." *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 516-17 (1st Cir. 1996). That interpretation starts with the text of the Agreement. *Id.* at 519-20. The Court ought not consider extrinsic evidence when it deems that text unambiguous, as such evidence may not be used to "contradict the written terms of the agreement." *Id.* To facilitate its interpretation of the text of the Agreement, the Court can rely on certain aids such as "the circumstances surrounding the formation of the [Agreement], any technical meaning words used may have had to the parties, and any other documents expressly incorporated in[to] the [Agreement]." *Id.* at 517 (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) (internal quotation marks omitted)).

### B. The Agreement's plain language for modifications does not incorporate the Rule 60(b) standard to alter or amend a judgment.

Because the Agreement is to span up to six years, A.69, § XIII(A), the Parties wisely included a modification provision:

> <u>Modifications.</u> This Agreement may be modified only by consent of the Parties in writing, signed by both Parties and approval of the Court except that the Parties may extend any time limit or deadline in this

> Agreement, other than the termination date, by mutual written consent without Court approval.

A.71, § XIV.G. The terms of the Agreement thus expressly allow the Parties modify their agreement, with and without Court approval, depending on the nature of the modification. A.71, § XIV.G.

Since the Agreement became effective in December of 2024, the Parties have agreed to extend certain deadlines within the Agreement. As noted, those deadline extensions are published on the website maintained by Maine regarding the Agreement.[19] The Parties did not seek or require Court approval for those deadline extensions. A.71, § XIV.G.

As explained above, the Modified Agreement was also consented to and signed by the Parties in accordance with the modification provision. A.117. But the nature of the modifications in the Modified Agreement exceeded deadline extensions and thus required "approval of the Court." A.71, § XIV.G. The Modified Agreement reflected appropriate and necessary changes to achieve the Agreement's goals and requirements in light of the changes and developments that occurred during its implementation. In its decision on the motion to modify, the District Court concluded the Parties' Agreement was "akin to a consent decree and" that "Rule

[19] *See* Me. Dep't of Health and Human Servs., *The Children's Behavioral Health Settlement Agreement*, https://www.maine.gov/dhhs/obh/support-services/childrens-behavioral-health/settlement-agreement (last visited July 9, 2026).

60(b) governs the Parties' motion for modification." Add. 16-17.

That legal conclusion is wrong for two reasons. First, it fails to consider the text of the Agreement. *See Charter Int'l Oil Co.*, 83 F.3d at 519-20. Had the Parties intended to incorporate the standards of Rule 60(b) into the modification provision, they would have said so. But the Parties did not do so, nor did they reference any of the circumstances found in Rule 60(b), such as "mistake, inadvertence," "newly discovered evidence," or fraud," in the Agreement's modification provision. Fed. R. Civ. P. 60(b)(1)-(3). The District Court was thus wrong to import that standard, wholesale, into the modification provision of the Agreement. That error is plain here because both Parties objected to the use of the Rule 60(b) standard. Add. 5. *Cf. Navarro-Ayala*, 951 F.2d at 1339 (explaining principles of federalism weigh against applying standard of review that would be inconsistent with the parties' consent). Because the court's conclusion is at odds with the Agreement's plain language, the court's order should be vacated. *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) ("[T]he instrument must be construed as it is written").

Second, if the Parties had intended Rule 60(b) to apply to modifications of the Agreement, the Parties need not have included any modification provision at all. Because the District Court retained jurisdiction to enforce the terms of the Parties' Agreement, A.39, the Agreement functionally was incorporated into the Court's order of dismissal. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

381-82 (1994). Accordingly, while Rule 60(b) is an available method to modify the Settlement Agreement, that does not mean that Rule 60(b) is the only method of modifying the Agreement. Courts that have retained jurisdiction over a settlement agreement have evaluated separate modification provisions in those agreements outside the rubric of Rule 60(b). *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 975 F.3d 770, 777 (9th Cir. 2020) (affirming modification of class action settlement agreement over which the trial court retained jurisdiction that was made in accordance with the agreement's modification provision); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 128-30 (D.D.C. 2015) (evaluating whether requirements of modification provision in settlement agreement over which the court retained jurisdiction had been met separately from Rule 60(b)); *United States v. Guam*, No. CV 02-00022, 2015 WL 13776540, at *4–5 (D. Guam Mar. 25, 2015) (evaluating whether requirements of modification provision in settlement agreement over which the court retained jurisdiction had been met before turning to Rule 60(b)). Regardless, by equating the Parties' motion to modify the Agreement pursuant to their negotiated modification provision with a Rule 60(b) motion for relief from judgment, the court rendered the Agreement's modification provision superfluous. That was error.

Further, the District Court's reliance on *Aronov v. Napolitano*, 562 F.3d 84 (1st Cir. 2009) (en banc), and *Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1 (1st

Cir. 2011), to support its interpretation of the Agreement was misplaced. Add. 7-8. Neither *Aronov* nor *Hutchinson* directly addressed the modification of a settlement agreement or consent decree in accordance with its terms. Instead, both cases addressed an entirely separate issue: whether the plaintiffs were the prevailing parties for purposes of attorney fees.[20] *Aronov*, 562 F.3d at 89-94; *Hutchinson*, 636 F.3d at 9-11. The question in both cases turned on the nature of the underlying agreement, i.e., a consent decree, and whether it met the judicial imprimatur requirement—not the standard by which a court approves a modification to that underlying agreement. *See Aronov*, 562 F.3d at 89-90; *Hutchinson*, 636 F.3d at 9. Indeed, neither case addressed a modification provision within a settlement agreement or the application of Rule 60(b), and neither case supports the application of Rule 60(b) here.

### C. The District Court erred by failing to apply ordinary contract principles when analyzing the modification provision of the Agreement.

Interpretation of the modification provision of the Agreement is governed by ordinary contract principles. *Navarro-Ayala*, 951 F.2d at 1339. The intent of the parties is a key factor in interpreting any contract or settlement agreement.[21]

[20] The ADA does not permit the Unted States as a prevailing party to recover "attorney's fees," "litigation expenses," or "costs." 42 U.S.C. § 12205.

[21] The Agreement is to "be interpreted in accordance with federal law and the laws of the State of Maine." A.69, § XII.B.

*Hodgkins v. New England Tel. Co.*, 82 F.3d 1226, 1230 (1st Cir. 1996) ("Under Maine law, the paramount principle in the construction of contracts is to give effect to the intention of the parties" (quotation marks omitted)); *S. Kingston Sch. Comm. v. Joanna S.*, 773 F.3d 344, 354 (1st Cir. 2014). Under Maine law, "a contract is to be interpreted to give effect to the intention of the parties as reflected in the written instrument, construed in respect to the subject matter, motive and purpose of making the agreement, and the object to be accomplished." *Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, ¶ 26, 1 A.3d 416 (quoting *Estate of Barrows*, 2006 ME 143, ¶ 13, 913 A.2d 608).

The District Court erred because it did not address the key question: what did the Parties intend the court's role to be in approving modifications to the Agreement that are not extensions of deadlines? *See Navarro-Ayala*, 951 F.2d at 1339. The District Court never posed or answered this question in its analysis. Add. 1-24. The District Court should have looked to the language of the Agreement, *see Charter Int'l Oil Co.*, 83 F.3d at 519-20, including similar phrases used within the Agreement, and the Agreement's purpose and object, *see Coastal Ventures*, 2010 ME 63, ¶ 26, 1 A.3d 416, in order to determine what the Parties intended by the phrase "approval of the Court" in the modification provision. If the court determined that the language was ambiguous as to the Parties' intent, the court could have then considered or asked for extrinsic evidence to interpret the Agreement. *See Navarro-*

*Ayala*, 951 F.2d at 1343 n.21 ("evidence extrinsic to the decree may be used to determine the meaning of the stipulation"); *I.C.C. v. Holmes Transp., Inc.*, 983 F.2d 1122, 1126 (1st Cir. 1993) (noting district court properly considered extrinsic evidence of the parties' intent with respect to a consent decree).

Because the District Court failed to consider ordinary contract principles when interpreting the Agreement, this Court should vacate the District Court's decision and remand for consideration and application of those principles to the Agreement's modification provision.

## II. Application of Rule 60(b) to settlements spanning multiple years requires a flexible approach.

Even though Rule 60(b) does not govern here, the District Court nevertheless erred in its application of its provisions for two related reasons. *See Baez v. Baymark Detoxification Servs., Inc.*, 123 F.4th 62, 67 (1st Cir. 2024) ("the district court's decision to grant or deny relief under Rule 60(b)" is reviewed "for abuse of discretion" (quotation marks omitted).

*First*, the District Court wrongly interpreted *BLOM Bank SAL v. Honickman*, 605 U.S. 204 (2025), as modifying or overruling the flexible approach to Rule 60(b) the Supreme Court explained in *Rufo v. Inmates of Suffolk County*, 502 U.S. 367 (1992). Add. 17. That stretches *BLOM Bank* too far.

*Rufo* recognized court enforceable agreements that resolve litigation involving the statutory or constitutional rights of individuals "often remain in place

for extended periods of time" and "the likelihood of significant changes occurring during the life of the decree is increased." 502 U.S. at 380. Accordingly, the Supreme Court endorsed a "flexible approach" to "modifying such decrees" "is often essential to achieving the goals of reform litigation." *Id.* at 381. "[T]he public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Id.* at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

*BLOM Bank*, on the other hand, addressed the attempt of a group of plaintiffs to reopen a judgment after dismissal in order to amend their complaint. 605 U.S. at 208-09. Unlike in *Rufo*, the parties in *BLOM Bank* were private actors, there was no ongoing basis for the District Court to exercise its jurisdiction, and there was no multi-year settlement agreement involving the provision of essential government services. *BLOM Bank* did not purport to overrule or set aside *Rufo*, and the District Court's rejection of *Rufo's* flexible approach was error. *Cf. Alexis Lichine & Cie v. Sacha A. Lichine Est. Selections, Ltd.*, 45 F.3d 582, 586 (1st Cir. 1995) (distinguishing between an institutional reform settlement and one "based on a negotiated bargain in a commercial case between private parties").

*Second*, "the dynamics of institutional reform litigation differ from those of other cases." *Horne v. Flores*, 557 U.S. 433, 448 (2009). The finality of judgments has less weight when a case involves a multi-year settlement agreement in which a State commits to improve its Medicaid system in order to achieve a particular outcome. "[T]he passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 448. Applying Rule 60(b) in an overly rigid way precludes parties from adapting to changing circumstances in the most efficient manner. Such application also undermines the strong public policy favoring settlements "as a preferred alternative to costly, time-consuming litigation." *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) (quoting *Mathewson Corp. v. Allied Marine Indust., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987)).

## CONCLUSION

For the reasons stated above, the State of Maine asks the Court to vacate the District Court's denial of the Parties' Motion to Modify.

Dated: July 14, 2026

Respectfully submitted,

AARON M. FREY
Attorney General

THOMAS A. KNOWLTON
Deputy Attorney General
thomas.knowlton@maine.gov

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8570

*Attorneys for State of Maine*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6). I further certify that all text in this brief is in proportionally spaced Times New Roman Font and is 14 points in size. I further certify that, according to the word count function of the word-processing software used to prepare this opposition brief (Microsoft Word 365), this brief contains 7,237 words.

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
207–626–8570
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, Maine 04333–0006

*Attorney for State of Maine*

**CERTIFICATE OF SERVICE**

I, Kimberly L. Patwardhan, hereby certify that on July 14, 2026, I electronically filed the State of Maine's Principal Brief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
207–626–8570
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, Maine 04333–0006

*Attorney for State of Maine*

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24-cv-00315-SDN |
| | ) | |
| STATE OF MAINE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON JOINT MOTION TO AMEND SETTLEMENT AGREEMENT**

This issue is before the Court on a joint motion by the United States of America and State of Maine ("the Parties"), ECF No. 31, to modify the Settlement Agreement, ECF No. 20-1, in this case. The Parties seek to make several amendments to the original Settlement Agreement, including, among other things, the removal of an Independent Reviewer position. *See* ECF Nos. 31 at 1–2 (Motion to Amend), 31-1 (Proposed Modified Agreement). For the reasons that follow, the Parties' motion to amend is DENIED.

## I. Background

In September 2024, the United States brought this matter against the State of Maine, seeking "to enforce the rights of Maine children with behavioral health disabilities who are unnecessarily segregated—or at serious risk of segregation—in institutions because Maine has failed to provide them access to the behavioral health services they need in the community." ECF No. 1 at 1. On November 26, 2024, the Parties reached a Settlement Agreement and jointly moved to dismiss the action and for this Court to retain jurisdiction over the matter in order to enforce the Agreement. ECF No. 17. Among other provisions, the November 2024 Settlement Agreement included a provision for an "independent reviewer" to "gather, analyze, and report on information and data reflecting

the State's progress in complying with all sections of this [Settlement] Agreement." ECF No. 20-1 at 25. On December 20, 2024, I entered an Order granting the motion to dismiss and retaining jurisdiction to enforce the Parties' Settlement Agreement, and attached the Settlement Agreement as an exhibit to the Order. *See* ECF No. 20 (Dismissal Order). The Clerk of Court entered a judgment of dismissal on December 20, 2024. ECF No. 21.

Seven months later, on July 28, 2025, a group of four public interest organizations—Disability Rights Maine, the American Civil Liberties Union of Maine, GLAD Law, and the Center for Public Representation (collectively "the Coalition")—filed a motion for leave to file an amicus brief in anticipation of the Parties filing a joint motion to amend the Settlement Agreement, ECF No. 24, which the Parties opposed, ECF Nos. 28, 29. I granted the motion for leave to file an amicus brief. ECF No. 35.

On September 2, 2025, the Parties filed the instant joint motion to amend the Settlement Agreement. ECF No. 31. The Coalition urges me to reject the joint motion to modify the Agreement. ECF 37. After further briefing by the Coalition and the Parties, *see* ECF Nos. 41, 43, I set the matter for oral argument on October 22, 2025, ECF No. 51. Following the hearing, the Parties and Coalition submitted another round of briefing addressing the Court's authority to grant or deny the Proposed Modified Agreement. *See* ECF Nos. 53, 54, 55, 56, 57.

**A. Proposed Modifications**

There are several requested modifications to the Settlement Agreement, which can be organized into general categories. *See* ECF No. 31-2. The first modification concerns individual assessments for children who have been arrested and adds language that the arrest must be made known to the Maine Department of Health and Human Services ("DHHS") in order to trigger review. ECF No. 31-2 at III.A.3.iv; *id.* at III.B.7.x.b. The

second lowers the frequency of reporting about children whose families reject home services or who are found to need services that cannot be provided at home. *Id.* at III.B.8.v. The third—and seemingly most contested point—removes the Independent Reviewer position, to whom the State was obligated to provide data on its compliance with the Agreement.[1] *Id.* at IX, XI. Downstream of removing that position, the Proposed Modified Agreement dispenses with the Independent Reviewer's assessments for certain children. *Id.* at III.B.8.vi. The fourth modification removes requirements for the State to engage in community outreach with families, children, and stakeholders, including members of the Coalition. *Id.* at V.A. The fifth and sixth modifications change the State's reporting and training requirements. *Id.* at VI.G, VI.I. The final change removes the State's requirement to conduct community reintegration planning for children committed to a juvenile correction facility. *Id.* at IX.H. The Proposed Modified Agreement also requires the State to submit to the United States a new implementation plan by November 1, 2025, a deadline which precedes the date of this Order. *Id.* at IX.B.

## II. Discussion

In the pending motion, the Parties seek to modify the Settlement Agreement—which they voluntarily entered into—over the objection of the Coalition, which is not a party to the Agreement. The Court's Dismissal Order of the underlying case—issued pursuant to Federal Rule of Civil Procedure 41(a)(2)[2]—states "the Court specifically retains jurisdiction to enforce the Parties' Settlement Agreement, attached to this Order

---

[1] In its reply in support of the motion to amend, the Parties represent that removing the Independent Reviewer position will save taxpayer dollars and the State will self-report the data to the United States that the Reviewer otherwise would have collected and reported. ECF No. 43 at 6; ECF No. 41 at 6.

[2] Fed. R. Civ. P. 41(a)(2) says, "[A]n action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."

as Exhibit A, in accordance with its terms and for its duration."[3] ECF No. 20 at 1. The Court thus retains ancillary jurisdiction over the enforcement of the Settlement Agreement for the duration of the Agreement's terms. *See Commw. Sch., Inc. v. Commw. Acad. Holdings LLC*, 994 F.3d 77, 84 (1st Cir. 2021) ("[T]he district court may retain jurisdiction to enforce a settlement in a dismissed case as long as the order of dismissal either incorporates the settlement agreement or explicitly reserves jurisdiction to enforce the settlement."); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (recognizing "ancillary jurisdiction" over a "settlement agreement [that] had been made part of the order of dismissal"). Because this Court expressly retained jurisdiction in its Dismissal Order and incorporated the terms of the Settlement Agreement into its Order by attaching the Agreement as an exhibit, this Court "has jurisdiction to *enforce* the terms of the Settlement Agreement."[4] *Warren v. City of Chico*, No. 2:21-CV-00640, 2025 WL 974068, at *3 (E.D. Cal. Mar. 31, 2025) (emphasis in original); *see Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166, 187 (1867) ("[T]he rule is universal, that if the power is conferred to render the judgment or enter the decree, it also includes the power to issue proper process to enforce such judgment or decree.").

The crux of the issue before the Court today is under what circumstances the Court may grant the relief requested. The operative modification clause in the Settlement Agreement states, "This Agreement may be modified only by consent of the Parties in writing, signed by both Parties and approval of the Court except that the Parties may

---

[3] The Settlement Agreement states it shall terminate six years from its effective date "if the State is in substantial compliance with the Agreement, without further action of the Court," unless otherwise extended or terminated. ECF No. 20-1 at XIII.A.

[4] According to the State, the Court did not incorporate the terms of the Agreement into the Dismissal Order. ECF No. 54 at 2. However, "embody[ing] the settlement contract in its dismissal order or . . . retain[ing] jurisdiction over the settlement contract" has "the same effect." *Kokkonen*, 511 U.S. at 381–82.

extend any time limit or deadline in this Agreement, other than the termination date, by mutual written consent without Court approval." ECF No. 20-1 at XIV.G. The Parties and Coalition dispute the extent of the Court's authority to approve, or—more to the point—not approve, the joint modification. The Coalition contends the Settlement Agreement should be evaluated under the requirements of Federal Rule of Civil Procedure 60(b), which requires a heightened showing of a change in circumstances warranting the modification and heavily prioritizes protecting the finality of judgments. Thus, according to the Coalition, because the Parties cannot meet the 60(b) standard, the Court should deny the request to modify the Agreement. ECF No. 55 at 2. The Parties contend Rule 60(b) does not apply and the Court should grant the joint motion without applying Rule 60(b) because the jointly agreed-upon changes are "unrelated to remedying the violation" at issue and "do not lessen Maine's obligations to children with behavioral health disabilities under the Agreement." ECF No. 57 at 2. Alternatively, the United States posits the Proposed Modified Agreement meets the "flexible" Rule 60(b) standard, which should give "significant weight" to the views of government officials. ECF No. 53 at 2.

### A. Applicable Standard for Modification

#### *1. Terms of the Agreement*

Both the State of Maine and the United States argue the Court should grant the modification request because the express terms of the Agreement allow the Parties to jointly amend with court approval. *See* ECF No. 41 at 1; ECF No. 54 at 3. The Parties make several sub-arguments which are interwoven with this overarching concept. The Coalition asserts that the Settlement Agreement is effectively a consent decree, modifiable only upon a heightened showing of changed circumstances pursuant to Rule 60(b). *See* ECF No. 55 at 2.

*First*, the Parties urge the Court to confine its analysis to the terms of the Agreement itself, which does not specify a standard for modification or require an analysis under Rule 60(b). The Coalition contends that even if the Court considers only the terms of the Agreement, the language of the modification provision—with "consent of the Parties in writing . . . and approval of the Court," together with the Court's retention of jurisdiction to enforce the Agreement, ECF No. 20-1 at XIV.G—parallels that of a conventional consent decree. Accordingly, the Coalition argues, the requirements of Rule 60(b) must be satisfied to reopen and modify the final judgment order. *See* ECF No. 55 at 6; *Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 11 (1st Cir. 2011) ("The need for court approval of revisions in the terms of the Agreement closely resembles the process for amending a conventional consent decree.").

The United States cites two cases in support of its position that a court is limited to considering only the terms of the agreement when evaluating a joint motion for modification. First, it cites to *United States v. City of Seattle*, No. C12-1282, 2023 WL 5803364 (W.D. Wash. Sept. 7, 2023), in which the parties sought termination of a consent decree that could occur, per the terms of the consent decree, only upon a finding of "sustained compliance" with its provisions. *Id.* at *1. Relevantly, the parties in *Seattle* were not seeking modification. *Id.* at *2. The *Seattle* court granted the joint motion solely "to the extent the Parties s[ought] a finding that the City ha[d] sustained full and effective compliance, for at least two years, with the commitments set forth in the Consent Decree." *Id.* at *1. Because the decree there explicitly set the standard under which termination—not modification—could occur, it provides limited guidance here. What is instructive, however, is the *Seattle* court's observation that the consent decree "is an order of the court, and therefore it is the responsibility of the court—rather than of the Parties—to

determine when it is appropriate to terminate the Consent Decree and dismiss this action." *Id.* at *2.

The United States also cites to *United States v. North Carolina*, No. 5:12-cv-557, slip op. (E.D.N.C. Dec. 12, 2024), Dkt. No. 48, in which the parties moved jointly for a modification to their court-ordered settlement agreement based on substantial compliance by the State. *See* Dkt. No. 47 at 4. The district court granted the motion without analysis or explanation in a one-paragraph order. *See* Dkt. No. 48. Thus, *North Carolina* does not support the parties' contention that the joint motion should be granted here, where the parties are not arguing compliance. *See* ECF No. 53 at 1.

By contrast, two First Circuit cases offer instructive guidance for evaluating a settlement agreement that has been incorporated into a court order to determine whether it functions, in substance, as a consent decree. In *Aronov v. Napolitano*, 562 F.3d 84 (1st Cir. 2009) (en banc), the First Circuit considered whether a court-ordered settlement agreement sufficed to support an award of attorneys' fees under a statute permitting fees for "court-ordered consent decree[s]." *Id.* at 89. To determine whether the court-ordered settlement agreement at issue was sufficiently akin to a consent decree, the court instructed "that the formal label of 'consent decree' need not be attached [to the order at issue]; it is the reality, not the nomenclature[,] which is at issue." *Id.* at 90. The critical inquiry is not what the order's label says, but whether the order is the "functional equivalent of a consent decree" or "whether the order contains the sort of judicial involvement and actions inherent in a 'court-ordered consent decree.'" *Id.*

In *Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, the First Circuit again considered in the attorneys' fees context whether a court-approved settlement agreement was sufficiently similar to a consent decree. In concluding the order at issue qualified as

a consent decree, the court emphasized the "district court's ongoing role" with the settlement agreement and the fact that the agreement "is subject to modification only upon mutual written assent of the parties *and* with the court's concurrence." *Id.* at 11 (emphasis in original). The court took pains to note that "[t]he need for court approval of revisions in the terms of the Agreement closely resembles the process for amending a conventional consent decree." *Id.*

According to *Aronov* and *Hutchinson*, the Court must assess the substance of an agreement incorporated into a court order to determine whether a dismissal order incorporating the agreement functions as a consent decree with its attendant obligations. Accordingly, the Court rejects the Parties' argument that it is constrained to consider solely the text and title of the Agreement rather than the substance of the Agreement and its relationship to the Dismissal Order, which retains jurisdiction and incorporates the Agreement.

*Second*, the State of Maine asserts that the Order dismissing the matter and attaching the Agreement is not a consent decree and instead constitutes a conditional dismissal under Federal Rule of Civil Procedure 41(a)(2). *See* ECF No. 54 at 4. As such, according to the State, the Court should evaluate the proposed modification under the same standard it applied when granting the original Settlement in December 2024. *See id.* The Coalition disputes this premise, arguing that such a standard is unworkable and provides no clear benchmark for evaluation. ECF No. 56 at 4.

Under Rule 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). The purpose of such a dismissal is to permit the plaintiff, with the Court's approval, to voluntarily dismiss an action "as long as 'no other party will be prejudiced.'" *Doe v.*

*Urohealth Sys., Inc.*, 216 F.3d 157, 160 (1st Cir. 2000) (quoting *P.R. Maritime Shipping Auth. v. Leith*, 668 F.2d 46, 50 (1st Cir. 1981)). According to the State, because the Court originally dismissed the case according to Rule 41(a)(2), it necessarily "determined the [original] dismissal terms were 'proper.'" ECF No. 54 at 6. The State argues that therefore the Court should apply the "same review" to the modification request, particularly where the "Modified Agreement is of limited duration and does not require ongoing Court involvement," and the "Parties have agreed to the modification, and the substantive relief in the Modified Agreement remains unchanged." *Id.*

Strangely, the Parties do not directly address the fact that Rule 41(a)(2) applies to "Dismissal of Actions" whereas what they seek here is a modification of an agreement that requires Court approval. In evaluating a voluntary *dismissal* under Rule 41(a)(2), the Court may consider factors such as "'the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation [of] the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant.'" *Colón-Cabrera v. Esso Standard Oil Co. (P.R.), Inc.*, 723 F.3d 82, 88 (1st Cir. 2013) (quoting *Doe*, 216 F.3d at 160). None of those considerations neatly map onto the question of whether the Proposed Modified Agreement should be granted, presumably because Rule 41 applies to dismissals, not modifications. "Because '[i]t is not the obligation of [the] court to research and construct the legal arguments open to parties, especially when they are represented by counsel,' a 'district court is free to disregard arguments that are not adequately developed.'" *Michnovez v. Blair, LLC*, No. 10-CV-110, 2011 WL 3665412, at *1 (D.N.H. Aug. 22, 2011) (quoting *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 668 (7th Cir. 1998), then quoting *Higgins v. New Balance Ath. Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir.

1999)). Here, the Parties evince no argument as to why the modification would be "proper" or not prejudicial, let alone why the Court should apply a rule governing dismissals to a proposed modification of a settlement agreement that the Court must approve, or not, for effectuation. The Court therefore finds no benchmark against which to measure whether the proposed modifications would have been granted or denied in December 2024 and rejects this second argument.

*Third*, the United States emphasizes that courts have routinely granted similar modifications without applying Rule 60(b). *See* ECF No. 53 at 1. The Coalition submits the cases the United States cites are inapposite and do not squarely address the question of whether Rule 60(b) applies in this context. *See* ECF No. 55 at 5–6.

Upon inspection of the cited cases, the Court agrees with the Coalition. In *Seattle*, 2023 WL 5803364, the parties sought termination of a consent decree and the court was therefore limited to determining whether the parties had substantially complied with its terms. There was no reason for the court to invoke Rule 60(b) because the consent decree itself spelled out the standard for termination. In *Stuart v. Roache*, No. 89-2348, 1991 WL 487238 (D. Mass. Apr. 12, 1991), one sentence in the factual background reflected that the district court granted a motion to modify a consent decree, presumably without applying Rule 60(b) but providing no analysis or explanation. *See id.* at *2 ("Judge McNaught granted the joint motion by MAMLEO and the Department to extend the consent decree to cover one additional round of promotions."). The same is true of the order in *North Carolina*, No. 5:12-cv-557, slip op., which applies no rationale for the district court's thinking. The Court finds none of these cases helpful, let alone persuasive or controlling.

*Finally*, the United States cites *N.A.A.C.P. v. Donovan*, No. CIV.A.78-850, 2009 WL 792301 (D. Mass. Mar. 17, 2009), to support its argument that this Court should grant the modification because it is a joint proposal of the parties. *See* ECF No. 53 at 1–2. In *N.A.A.C.P.*, the Massachusetts district court had apparently previously entered joint modifications of a consent decree without issuing an opinion and, presumably, without applying Rule 60(b). 2009 WL 792301, at *2. However, the court also expressly noted that it "maintains jurisdiction to exercise power to 'modify its decree in light of changed circumstances,' a power reflected in Fed. R. Civ. P. 60(b)(5)" but "can make modifications to consent decrees only on a showing of 'a significant change in circumstances'" and "[t]o the extent that NAACP requests further modifications to the Consent Decree, [the court] will evaluate such requests under the demanding standard outlined in" Rule 60(b)(5). *N.A.A.C.P.*, 2009 WL 792301, at *7. As such, to the extent this opinion—which does not discuss at all the circumstances of the prior joint motions to modify—is instructive, it is that it emphasizes the important role of Rule 60(b)(5).

The United States further contends that the cases the Coalition cites are inapposite because they involved single-party motions for modification. *See* ECF No. 57 at 1. Rule 60(b), however, draws no distinction between single-party and joint motions. *See generally* Fed. R. Civ. P. 60(b). By its terms, Rule 60(b) provides the governing framework for all post-judgment motions to modify or terminate judgments. The Parties' contrary arguments fail to provide a cogent standard and would undermine the finality of judgments. *See Paul Revere Variable Annuity Ins. Co. v. Zang*, 248 F.3d 1, 5 (1st Cir. 2001) ("Rule 60(b) relief is extraordinary relief reserved for exceptional circumstances, given the countervailing interest in the finality of such orders." (quotation modified)). The Court will not read into the Federal Rules a requirement that the Rule itself does not

impose. With respect to the Settlement Agreement's language, it, if anything, supports heightened scrutiny by the Court when asked to approve—or decline—proposed modifications. *See* ECF No. 20-1 at XIV.G. ("This Agreement may be modified only by consent of the Parties in writing, signed by both Parties and approval of the Court . . . ."). The requirement of court approval cannot be read as a mere formality; otherwise, it would serve no purpose, and the Parties' requests would be subject only to rote ratification. That interpretation would also conflict with the Agreement's separate provision permitting automatic extensions of deadlines "by mutual written consent [of the Parties] *without* Court approval." *Id*. (emphasis added).

"In construing a settlement subsequently adopted by a court, [the court] appl[ies] the same basic rules that govern the interpretation of ordinary contracts." *Nault v. United States*, 517 F.3d 2, 4 (1st Cir. 2008). And general contract principles "avoid any interpretation that renders a provision meaningless." *Zhao v. CIEE Inc.*, 3 F.4th 1, 5 (1st Cir. 2021) (quotation modified). Reading the Agreement to erase the distinction between modifications requiring court approval and those granted automatically would render the approval requirement superfluous—an outcome contract law does not permit.

In sum, I do not adopt the Parties' reasoning that, in essence, the Agreement requires Court approval on joint motions for modification without any analysis or workable standard of review.

*2. Goals of the Agreement*

The Parties' second principal argument is that the requested modifications should be granted because they do not disturb the Agreement's original "goals"—namely, "to enable children with behavioral health disabilities to receive services at home if consistent with their family's wishes and appropriate to their needs." ECF No. 53 at 5; ECF No. 57 at

5–7. The Coalition responds that the Parties offer no meaningful framework for ascertaining whether the proposed modifications in fact align with those goals, rendering the argument amorphous. *See* ECF No. 55 at 6.

The Parties cite no caselaw for the claim that a court may modify a settlement agreement—after it has been finalized and incorporated into a dismissal order—simply because the proposed *modifications* align with the agreement's goals. Rather, the caselaw indicates district courts evaluate whether the goals of a consent decree have been achieved when facing a motion for *termination* of an agreement. *See, e.g.*, *Warren*, 2025 WL 974068, at *5 ("A court considering termination of a consent decree in light of performance of its specific terms 'must also consider the general goals of the decree which the terms were designed to accomplish.'" (quoting *Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011)); *Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (upholding district court's decision to terminate consent decree because "the decree accomplished its essential purposes and the situation improved greatly"); *United States v. City of Los Angeles*, No. 2:00-cv-11769, slip op. at 19 (C.D. Cal. July 17, 2009), Dkt. No. 416 (granting parties' motion to wind down a consent decree because "the decree accomplished its essential purposes" and L.A. had substantially complied with the decree (quoting *Metro. Transp. Auth.*, 564 F.3d at 1123)); *United States v. Essa Bank & Tr.*, No. CV 23-2065, 2025 WL 2087776, at *5 (E.D. Pa. July 23, 2025) ("Weighing any alleged hardship to [defendant] against the benefits of continued enforcement and considering whether the Order's objectives have been achieved, termination of the Consent Order is not warranted."). District courts have considered a goal-oriented perspective in motions to terminate because termination is usually predicated on "substantial compliance" with the terms of the decree. "Substantial

compliance," in turn, does not require "perfection," but does require the district court to conclude that the decree "'has served its purpose and will not be extended.'" *Metro. Transp. Auth.*, 564 F.3d at 1119. If anything, extending that concept to motions for modification would cut against the requested relief here, because the Parties have only just begun to implement the Settlement Agreement. Thus, even if a standard governing termination of a consent decree were applicable, it is plain that the Parties are not yet in substantial compliance with the Agreement.

To the limited extent that courts have considered the issue in terms of modification, they still have required the moving party to "'offer[] substantial evidence that . . . the modification was essential to attaining that goal [of the original consent decree].'" *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 n.6 (1992) (quoting *N.Y. State Ass'n for Retarded Child. Inc. v. Carey*, 706 F.2d 956, 969 (2d Cir. 1983)). The Parties have not presented such substantial evidence here. Indeed, there is no evidence that reducing the frequency of reporting, trainings, and community outreach and removing the Independent Reviewer will do anything to facilitate the State's compliance with the Agreement, and may in actuality make it harder to ascertain whether compliance is being achieved. Therefore, the Court disagrees both with the Parties' contention that modification should be granted if it aligns with the Agreement's goals and the concept that these current modifications, without more evidence, actually further the Agreement's goals of protecting Maine's children.

*3. Application of Rule 60(b)*

Because I find the Parties' arguments to apply other standards unavailing, I turn to the question of whether and to what extent Rule 60(b) applies to this joint motion to modify the Settlement Agreement.

Federal Rule of Civil Procedure 60(b)(5) governs modifications of a court's final judgment and permits a district court to relieve a party from a final order or judgment on grounds of: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; (3) fraud . . . by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b). Rule 60(b)(5) generally applies to requests to modify federal consent decrees and allows for modification if the moving party makes a showing of a "significant change in circumstances." *Rufo*, 502 U.S. at 383; *see also BLOM Bank SAL v. Honickman*, 605 U.S. 204, 214 (2025) ("It is Rule 60(b)'s standard—and *only* Rule 60(b)'s standard—that applies when a party seeks relief from final judgment." (emphasis in original)). However, there is a dearth of caselaw in the First Circuit indicating whether Rule 60(b)(5) similarly applies to modifications of court orders of dismissal that retain jurisdiction and attach settlement agreements such as the one at issue here.

Ultimately, as I must, I turn to the Supreme Court and First Circuit to see what controlling precedent I can glean. In *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Services*, 532 U.S. 598 (2001), upon which the First Circuit's reasoning in *Aronov* is predicated, the Supreme Court explained that consent decrees and private settlements tend to be mutually exclusive. The *Buckhannon* Court wrote, "Private settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." *Id.* at 604 n.7. What distinguishes a consent decree from a private

settlement is that "[t]he parties to a consent decree expect and achieve a continuing basis of jurisdiction to enforce the terms of the resolution of their case in the court entering the order." *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 280 (4th Cir. 2002), *overruled on other grounds by Stinnie v. Holcomb*, 77 F.4th 200 (4th Cir. 2023).

Here, the Court maintains a "continuing basis of jurisdiction," *id.*, over the Settlement Agreement until its expiration by the express terms of the Dismissal Order, *see* ECF No. 20 at 1 ("[T]he Court specifically retains jurisdiction to enforce the Parties' Settlement Agreement . . . ."). The language of the Agreement and the Dismissal Order envision an ongoing role for this Court to oversee the enforcement of the Agreement until its expiration or termination. *See Kokkonen*, 511 U.S. at 381. In reaching their original decision to settle in December 2024, the Parties apparently agreed to submit themselves to the continuing jurisdiction of this Court. They could have elected to remove the provision that requires the Court's approval for all future modifications, or they could have moved for dismissal under Federal Rule of Civil Procedure 41(a)(1)(ii), "which does not by its terms empower a district court to attach conditions to the parties' stipulation of dismissal." *Kokkonen*, 511 U.S. at 381. But they did not do so.

Because "[t]he need for court approval of revisions in the terms of the Agreement closely resembles the process for amending a conventional consent decree," *Hutchinson*, 636 F.3d at 11, the Court concludes that the Order of Dismissal here retaining jurisdiction and attaching the Settlement Agreement is akin to a consent decree and Rule 60(b) governs the Parties' motion for modification. *See also id.* at 11 n.3 ("It is the presence of *continuing judicial oversight* that pushes the ball across the goal line and thus suffices to give a settlement the required judicial imprimatur." (emphasis in original)). This decision accords with numerous other federal courts which have found that modifying a settlement

agreement attached to an order of dismissal for which a court has retained jurisdiction is a modification of a court order governed by Rule 60(b). *See, e.g.*, *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016); *Keeling v. Sheet Metal Workers Int'l Ass'n, Local Union 162*, 937 F.2d 408, 410 (9th Cir. 1991); *United States v. Gov't of Guam*, No. CV 02-00022, 2015 WL 13776540, at *4–5 (D. Guam Mar. 25, 2015); *In re Black Farmers Discrimination Litig.*, 950 F. Supp. 2d 196, 199–201 (D.D.C. 2013); *Brown v. Dalton*, 312 F.R.D. 239, 242–44 (D.D.C. 2015); *Carter v. City of Charleston, S.C.*, 13 F. App'x 135, 138 (4th Cir. 2001).

*4. Required Showing Under Rule 60(b)(5)*

Because Rule 60(b)(5) applies, I now address the United States' argument that a more "flexible" 60(b) standard governs in this context. *See* ECF No. 57 at 5–6.

In proceeding under Rule 60(b)(5), courts, including in this district, generally apply what is known as the *Rufo* standard, which requires a showing of a "significant change" in facts or law rendering compliance "onerous," "unworkable," or "detrimental to the public interest." *Rufo*, 502 U.S. at 384; *see Consumer Advisory Bd. v. Glover*, 151 F.R.D. 496, 499 (D. Me. 1993) (applying the *Rufo* standard where the parties allege there was a substantial change in facts or law). "If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. As the Supreme Court has recently admonished, courts must interpret Rule 60(b) strictly. *BLOM Bank*, 605 U.S. at 212 ("'This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved.'" (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005))). The party—or in this instance, the parties—seeking the modification bears the burden of establishing that

revision of the judgment is warranted. *See Rosie D. by John D. v. Baker*, 958 F.3d 51, 56 (1st Cir. 2020).

The United States argues that if this Court is to apply Rule 60(b) to the motion to modify the settlement agreement, the Proposed Modified Agreement meets the *Rufo* standard for three reasons: First, the proposed changes are minor and thus the strict Rule 60(b) showing is not necessary, ECF No. 57 at 2; second, a "flexible" standard should apply because the Parties moved jointly to modify, ECF No. 53 at 2; and third, significant deference should be afforded to government officials and the government (on both sides) is moving for the modification in this instance, *id*. The Coalition rejoins respectively that, first, the proposed modifications are not minor because "they will likely cause eligible children to be excluded from the agreement's benefits, delay access to necessary services, and erode accountability," ECF No. 37 at 2; second, *Rufo* does not distinguish between single-party and joint motions, ECF No. 55 at 5–6; and third, the parties moving for modification should be awarded no deference in carrying their burden for modification, irrespective of their government status, *see id*. at 4.

In the first instance, *Rufo* establishes the Rule 60(b) "showing is not necessary to implement minor changes in extraneous details that may have been included in a [consent] decree (*e.g.*, paint color or design of a building's facade) but are unrelated to remedying the underlying constitutional violation." 502 U.S. at 383 n.7. The color of a building is certainly "extraneous" to the "vindication of a constitutional right." *Id*. But the same cannot be said for changing the State of Maine's reporting requirements and frequency, training requirements, and removing the oversight mechanisms of the Independent Reviewer. Rather, those modifications are intrinsic to the nature of the

Agreement at issue, which seeks to protect the rights of underprivileged children under the Americans with Disabilities Act.

Similarly, the United States' claim that courts have applied a "relaxed" Rule 60(b) standard in cases where there is a joint motion—rather than a motion by a single party—does not align with the caselaw it cites. *See* ECF No. 57 at 2–3. In *Bureau of Consumer Financial Protection v. Townstone Financial, Inc.*, 350 F.R.D. 32 (N.D. Ill. 2025), the district court declines to apply a relaxed standard for multiple reasons, chief among them that there was a substantial public interest in the finality of the judgment because the "alleged wrongdoing affected the [constitutional rights of the] public." *Id.* at 37. And although Seventh Circuit precedent indicated in the past that some courts had applied a more relaxed standard to joint motions, the *Townstone* court noted "[w]hether courts should continue doing so on joint motions is debatable, in light of the Supreme Court's recent decision [in *BLOM Bank*], in which it held that a 'very strict interpretation of Rule 60(b),' that is, only applying it in extraordinary circumstances, 'is essential if the finality of judgments is to be preserved.'" *Id.* at 37 n.6 (quoting *BLOM Bank*, 605 U.S. at 213).[5] This line of reasoning is compelling, particularly given the Settlement Agreement in this case involves highly complicated medical issues which were the subject of extensive negotiations between the Parties in service of the original settlement. If the public interest in finality were ever to weigh heavily in a case, it certainly would do so here where children's legal, constitutional, and medical rights are at stake.

[5] Some courts have gone a step further to say that a more stringent standard should apply to dismissal orders than consent decrees. *See Warren*, 2025 WL 974068, at *4 ("It is certainly arguable that a more stringent standard should apply where, as here, defendants seek to modify a settlement agreement incorporated by a dismissal order rather than a consent decree."). In light of my analysis here, I need not address that contention.

The United States' third argument is that "federalism concerns counsel in favor of deferring to the Parties' interests" as government officials. ECF No. 53 at 5. But its argument puts the cart before the horse. In *Rufo*, the Supreme Court stated "[n]o deference is involved in this threshold inquiry" of determining whether the moving party has borne its "burden of establishing that a significant change in circumstances warrants modification of a consent decree." 502 U.S. at 392 n.14. Only "once a court has determined that a modification is warranted" should the "principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials who must implement any modification." *Id*. The Court is thus required to first ascertain whether the moving parties have met their burden for modification before deference can be given. The Court cannot relax the Rule 60(b) standard as applied to a motion to amend merely because it is advanced by the government. To do otherwise would contravene all the cases where courts have applied the full strictures of Rule 60(b) even when the government is the moving party. *See, e.g.*, *Essa Bank*, 2025 WL 2087776, at *1 (applying the full *Rufo* standard under Rule 60(b) to United States' motion to terminate); *Warren*, 2025 WL 974068, at *6 (applying the "standard applicable to requests to modify a consent decree" under Rule 60(b) and *Rufo* to city government's motion to modify); *Rufo*, 502 U.S. at 378 (applying the heightened standard for a showing under Rule 60(b) to government official's motion to modify).

The United States' citation to *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004), is similarly faulty. *See* ECF No. 53 at 2. In *Frew*, the Supreme Court weighed whether the Eleventh Amendment precludes enforcement of a federal consent decree which bound state officials to administer a federal program pursuant to federal law. *Frew*, 540 U.S. at 442. Although the Court cautioned that deference should be accorded to state officials "in

deciding how best to discharge their governmental responsibilities," *id.*, the Court, as in *Rufo*, explained that such deference occurs only at the second stage of the inquiry: "If the State establishes reason to modify the decree, the court should make the necessary changes; *where it has not done so*, however, the decree should be enforced according to its terms." *Id.* (emphasis added). As the court further explained, the terms of the original consent decree established "a remedy the state officials themselves had accepted when they asked the District Court to approve the decree." *Id.* at 439. Here, too, the State of Maine agreed to the terms of the original Settlement Agreement when it subjected itself to this Court's continued jurisdiction and oversight for modifications.

In *United States v. City of Los Angeles*, No. 2:00-cv-11769, slip op., another case the United States materially cites in support of its argument, *see* ECF No. 53 at 4–5, the district court considered a joint motion by the City and United States to terminate[6] a consent decree, while community intervenors opposed the request and presented their own motion seeking to extend the decree. *Los Angeles*, slip op. at 2. The district court ultimately granted the parties' motion to terminate. In doing so, it concluded the "Community Intervenors have failed to meet any burden that they may have had of showing 'changed circumstances' (failure to substantially comply) warranting modification, i.e., extension, of the Decree." *Id.* at 18 n.3. The court underscored the same point later, observing that "[b]y the same token, *where circumstances have changed*, the Court may exercise 'the traditional power of a court of equity to modify its decree in light of changed circumstances.'" *Id.* at 26 (quoting *Frew*, 540 U.S. at 441) (emphasis added).

[6] The court construed the motion to terminate as a motion to amend the decree to apply a wind-down transition agreement, but noted "in the end the characterization does not control the outcome." *Los Angeles*, slip op. at 18 n.3.

*Los Angeles* stands for the same proposition as *Frew* and *Rufo*: the moving party must establish changed circumstances before the Court can appropriately weigh the proposed modification.

Because deference to government officials is warranted only at the second step of the analysis, I must first determine under *Rufo* whether "changed factual conditions make compliance with the decree substantially more onerous" or whether the decree "proves to be unworkable because of unforeseen obstacles," before approving the requested modifications. *Rufo*, 502 U.S. at 384. "The party seeking modification has the burden of showing 'a significant change either in factual conditions or in law.'" *Ricci v. Patrick*, 544 F.3d 8, 21 (1st Cir. 2008) (quoting *Rufo*, 502 U.S. at 384).

Here, it is not evident that there has been "a significant change either in factual conditions or in law [that] renders continued enforcement detrimental to the public interest" such that modification is appropriate. *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quotation modified). Neither party makes a colorable showing that retaining the Independent Reviewer position is "onerous," "unworkable," or "detrimental to the public interest." *Rufo*, 502 U.S. at 384. The State notes the individual who would have served as the Independent Reviewer will instead assume a newly-created subcontractor role, ECF No. 43 at 6, but that point, if anything, cuts against a conclusion that the Independent Reviewer position, as set out in the original Agreement, is unworkable. And although the United States offers various reasons for the remaining proposed changes, *see* ECF No. 57 at 6–8, those justifications do not appear to rise to the level of a significant change in circumstances—particularly given the Agreement was finalized less than nine months prior to the motion to modify. In fact, the United States provides no substantive rationale for why these changes must be made now, rather than at the time the original settlement

was negotiated. *See Rufo*, 502 U.S. at 385, 383 ("[M]odification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree" or "when it is no longer convenient to live with the terms of a consent decree."). Moreover, the Parties' claim that the State will save money by eliminating the Independent Reviewer position is unconvincing, *see* ECF No. 41 at 6, as other courts have held—and I agree—that "anticipated costs in complying do not constitute a significant change in factual circumstances," *Warren*, 2025 WL 974068, at *10. Thus, the Parties have failed to establish "a significant change either in factual conditions or in law" sufficient to justify modification. *Horne*, 557 U.S. at 447.[7]

Other courts have likewise rejected "suggest[ions] that a change in administration, by itself, constitutes good cause or offers an equitable reason sufficient to justify modifying the terms of a settlement agreement under Rule 60(b)(5)." *Ctr. for Biological Diversity v. Env't Prot. Agency*, No. 11-CV-00293, 2025 WL 901944, at *8 (N.D. Cal. Mar. 25, 2025). The United States' representations at oral argument that the Government's changed legal position alone should justify modification lacks support in caselaw and, if accepted, would invite endless renegotiation of court-ordered agreements involving the United States. *See id.* ("Were courts to adopt such an approach, it would mean, essentially, that parties could not enter into settlement agreements or consent decrees with an agency of the United States that spanned more than one administration as they could not count on adherence to the terms of the settlement agreement by subsequent administrations.").

[7] Rule 60(b)(6) provides another potential framework for modifying the Agreement, which contains a catchall provision providing a remedy for modification for "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6), and applies only if the other parts of the Rule, including Rule 60(b)(5), do not apply. Rule 60(b)(6) requires an even higher standard than 60(b)(5), and "should only be applied in 'extraordinary circumstances.'" *BLOM Bank*, 605 U.S. at 212 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)). If the Parties cannot carry their burden under Rule 60(b)(5), then they cannot meet it under Rule 60(b)(6)'s higher standard.

Because a relaxed Rule 60(b) standard does not apply and the Parties have not carried their burden to establish a change of circumstances sufficient to justify modification, the Court cannot reach the second step of deferring to the government officials' positions. Accordingly, the Court finds the Parties have not satisfied the heightened *Rufo* standard and modification is not warranted at this time.

## III. Conclusion

"The voluntary nature of the resolution of this case cannot be overemphasized." *Townstone*, 350 F.R.D. at 39. As the Supreme Court succinctly stated, "There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." *Ackermann v. United States*, 340 U.S. 193, 198 (1950); *see also Macias v. N.M. Dep't of Lab.*, 300 F.R.D. 529, 566 n.37 (D.N.M. 2014) ("[T]he fact that the movant consented to the obligations from which he is moving for relief, as well as the general policy of promoting settlement and the finality of judgments, support raising rule 60(b)(5)'s bar higher for orders that effectuate a settlement agreement than for orders by judicial fiat."). Here, the Parties seek to alter terms that were plainly bargained for and incorporated into the original Settlement Agreement. Absent a showing of changed circumstances under *Rufo* and given the strong public interest in finality, the Court must deny the Parties' present joint motion to amend.

For the foregoing reasons, the Court **DENIES** the Parties' joint motion to amend the Settlement Agreement without prejudice. ECF No. 31.

**SO ORDERED.**

Dated this 24th day of November, 2025.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**